1

2

3

4

5

6                                    The Honorable Franklin D. Burgess

7

8

                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
                            AT TACOMA

9                                    )
                                     )    **Case No.  C08-5503  FDB**
10   DANIEL MARTINEZ                  )    **Motion to Dismiss**
                                     )    NOTE ON MOTION CALENDAR:
11              Plaintiff,            )    December 12, 2008
                                     )
12        vs.                        )
                                     )
13   HELEN MARTINEZ and              )
     THE SUQUAMISH TRIBE             )
14                                    )
                                     )
15              Defendants.          )
     ————————————————————

16

17        **Comes Now**, the Suquamish Tribe, by and through counsel undersigned, and moves the

18   court to dismiss Plaintiff's complaint for lack of subject matter jurisdiction under Rule 12(b)(1)

19   FRCP and for failure to state a claim upon which relief may be granted under Rule 12(b)(6)

20   FRCP.

21        Plaintiff's complaint seeks relief under the Court's federal question jurisdiction under

22   28 USC §1331, and requests declaratory relief and injunctive relief under 28 USC §§ 2201

23   and 2202, alleging that the Suquamish Tribal Court acted beyond its authority by entering a

24   permanent order of protection against Plaintiff Daniel Martinez, a non-Indian then residing

25

26   within the Port Madison Reservation, for and on behalf of Helen Martinez,  an Alaska Native

1    Villager also residing within the Port Madison Indian Reservation.  Plaintiff Martinez further

2    alleges that the Suquamish Trial Court has acted beyond its authority in hearing a Dissolution

3    Petition filed by Helen Martinez.

4            Defendant Suquamish Tribe asserts that pursuant to the prudential rule requiring

5    exhaustion of tribal court remedies developed by the United States Supreme Court, the Court

6    lacks authority to act on its subject matter jurisdiction over this dispute unless or until tribal

7    remedies have been exhausted.  Plaintiff has not pleaded tribal exhaustion in his complaint, and

8    cannot plead it as the matters now stand in Suquamish Tribal Court.  Therefore, the Complaint

9    fails to state a claim upon which relief may be granted.  Defendant Suquamish Tribe

10   respectfully requests this Court to dismiss this action for failure to exhaust Suquamish Tribal

11   Court remedies, and failure to state a claim upon which relief may be granted pending further

12   action in the Suquamish Tribal Court.

13

14                                    **FACTS ON MOTION**

15           For purposes of this Motion only, Defendant Suquamish Tribe adopts every well-

16   pleaded fact set out in Plaintiff Martinez's Complaint.[1]  In addition, the affidavit of Marilyn

17   Kay, In-Court Clerk of the Suquamish Tribal Court, attached as Exhibit 2 to this Motion,

18   establishes the following facts related to the parties' litigation in the Suquamish Tribal Court:

19   **1.**   Both Helen Martinez and Daniel Martinez have histories of appearances before the

20           Suquamish Tribal Court dating back to at least the early 2000's.  Helen Martinez has had

21           assault charges filed against her in 2000, in Case No. 000512-CR, in 2002, in Case No.

22

23

24

25   [1] The Tribe takes exception to paragraph 3.5 of Plaintiff's Complaint, which misstates the content of the
     Petition for Domestic Violence Protection Order filed by Defendant Helen Martinez.  The Tribe has appended a
26   copy of the actual Petition as Exhibit 1 to this Brief which shows that Helen Martinez did not identify the locus of
     the violence.

020934-CR, and in 2005 in Case No. 050901-CR.  Each of these cases was eventually dismissed, with the last two being dismissed after Defendant completed mandatory counseling at the Tribe's Wellness Program that included attending Wellness counseling support groups.  In addition, in the 2005 case, Helen Martinez also moved into the Tribe's Transitional House (a half-way type house) for a portion of the counseling period.

2.  Helen Martinez had a domestic violence protective order entered against her on July 18, 2007, by the Suquamish Tribal Court, filed by Daniel Martinez.  In that case, Daniel Martinez appeared as Petitioner and filed an application for a domestic violence protective order against Helen Martinez.  On the same date, the Suquamish Tribal Court entered a Temporary Order of Protection against Helen Martinez, and in favor of Daniel Martinez and the couple's two children.

3.  On August 16, 2007, the Suquamish Tribal Court dismissed the domestic violence protective order at the joint request of the parties.  Thereafter, in 2007, Helen Martinez filed a petition for dissolution of marriage with the Suquamish Tribal Court, in which Daniel Martinez appeared as respondent.  Thereafter, the parties jointly stipulated to dismiss the Dissolution.

4.  On February 28, 2008, Helen Martinez brought a new case, Case No. 080239-C against Daniel Martinez, and sought an Order of Protection against Daniel Martinez.   A Temporary Order of Protection was issued by the Court on February 28, 2008 Daniel Martinez was personally served with notice of the March 27, 2008 hearing on the permanent Order of Protection on February 28, 2008.

5.  On March 27, 2008, Daniel Martinez appeared at the Hearing and presented his written testimony, which was filed with the Court on March 26, 2008.

6.   At the time Daniel Martinez and Helen Martinez each signed the permanent Order of Protection entered by the Court on March 27, 2008, neither party challenged the personal or subject matter jurisdiction of the Suquamish Tribal Court. Further, neither party appealed the Permanent Order of Protection, or filed a request for re-consideration on any issue with the Suquamish Tribal Court.  On May 12, 2008, Counsel for Mr. Martinez made a letter request to the Tribal Court for copies of the File in 080239-C and a copy of the hearing record from March 27, 2008.  The Court denied the request because the case is closed, and no appeals were filed.  No further written Motions have been filed in this matter by either party.

7.   On March 4, 2008, Helen Martinez filed a petition for Dissolution of Marriage with the Suquamish Tribal Court, Case No. 080302-C.

8.   On March 27, 2008, Mr. Martinez was personally served with the Dissolution Petition and Summons. On April 10, 2008, Mr. Martinez responded by filing a financial declaration with the Court and a proposed parenting plan.

9.   On May 14, 2008, Counsel for Mr. Martinez filed a Notice of Appearance (Notice) in Case No. 080302-C and in 080239-C.  The Notice stated: "Respondent asserts lack of subject matter and personal jurisdiction and by this appearance does not waive said objection."  To date, no Motions concerning personal or subject matter jurisdiction have been filed by either party in Case No. 080302-C.

## ARGUMENT

### I.     The Prudential Rule of Exhaustion

Under the prudential rule of exhaustion announced by the United States Supreme Court in *Nat'l. Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. 845 (1985) (exhaustion of tribal

Office of Tribal Attorney
P.O. Box 498
Suquamish, WA 98392
Tel. 360-598-3311;Fax 260598-4293

court remedies required before proceeding on federal question), and in *Iowa Mutual v.*

*LaPlante*, 480 U.S. 9 (1987) (exhaustion of tribal court remedies required before proceeding in

diversity cases), the Court held that:

> … the answer to the question whether a tribal court has the power to exercise
> civil subject matter jurisdiction over non-Indians in a case of this kind is not
> automatically foreclosed, as an extension of *Oliphant* would require.  Rather, the
> existence and extent of a tribal court's jurisdiction will require a careful examination of
> tribal sovereignty, the extent to which that sovereignty has been altered, divested, or
> diminished, as well as a detailed study of relevant statutes, Executive Branch Policy as
> embodied in treaties, and elsewhere, and administrative or judicial decisions.
> We believe that examination should be conducted in the first instance in the
> Tribal Court itself.  Our cases have often recognized that Congress is committed to the
> policy of supporting tribal self government and self determination. That policy favors a
> rule that will provide the forum whose jurisdiction is being challenged the first
> opportunity to evaluate the factual and legal basis for the challenge.  Moreover, the
> orderly administration of justice in the federal court will be served by allowing a full
> record to be developed in the Tribal Court before either the merits or any question
> concerning appropriate relief is addressed.

*Nat'l. Farmers Union*, 471 U.S. at 856-857 (footnotes omitted).

The principles elucidated in *Nat'l. Farmers Union* and *Iowa Mutual* continue to have

vitality.  In the Ninth Circuit, the recent cases of *Atwood v. Fort Peck Tribal Court*, 513 F.3d

943 (9th Cir. 2008), *Marceau v. Blackfeet Housing Auth.*, 540 F.3d 916 (9th Cir. 2008), and

*Boozer v. Wilder*, 381 F.3d 931 (9th Cir. 2004) demonstrate that when a tribal court's

jurisdiction over a non-member is raised as a federal question pursuant to 28 USC §1331,

exhaustion remains the rule when a tribal court has a "colorable" claim to jurisdiction.  *See, e.g.,*

*Atwood, 513 F.3d at 920, 921, (* "a district court has no discretion to relieve a litigant from the

duty to exhaust tribal remedies prior to proceeding in tribal court") and *Boozer, 381 F.3d* at 935

("Although §1331 encompasses the federal question whether a tribal court has exceeded the

1  lawful limits of its jurisdiction…exhaustion is required before such a claim may be entertained

2  by a federal court.")(*citing Natl. Farmers Union*, 471 U.S. at 857).[2]

3        In this case, the Suquamish Tribal Court has been given no opportunity to consider its

4  jurisdiction.  Plaintiff's federal complaint sets out issues and questions which have never been

5  brought before the Suquamish Tribal Court. Neither Plaintiff Martinez nor Defendant Helen

6  Martinez have ever raised subject matter jurisdiction in the proceedings now before the

7  Suquamish Tribal Court or in any of the parties' other cases before that court.  Further, no

8  Motions for Reconsideration raising the issue of jurisdiction were filed by either party.  Plaintiff

9  Martinez never appealed the issuance of the final Order of Protection to the Suquamish Tribal

10  Court of Appeals, and no applications for a writ have been filed with that Court.  As the cases

11  now stand before the Suquamish Tribal Court, the parties continue to file ordinary papers and

12  ordinary motions, but have raised nothing remotely related to the Tribal Court's subject matter

13  jurisdiction.  *See*, Ex. 2, Aff. of Marilyn Kay.

14        As the Tenth Circuit Court of Appeals noted in *Texaco, Inc. v. Zah*, 5 F.3d 1374 (10th

15  Cir. 1993), the exhaustion doctrine grows from three federal policy concerns:  (1) "Congress's

16  strong interest in promoting tribal sovereignty, including the development of tribal courts," *Id*.

17  at 1379 (citations omitted), (2) "to promote the orderly administration of justice," *Id*. at 1385,

18  and (3) "to obtain the benefits of tribal expertise."  *Id*. (citations omitted).  But if no party has

19  challenged subject matter jurisdiction in the tribal court and been issued a final decision, then

---

[2]There is some divergence in the federal cases concerning whether one raises the issue of failure to exhaust as an issue of federal subject matter jurisdiction under Rule 12(b)(1) FRCP, since the issue of whether a tribal court has exceeded its lawful jurisdiction under federal law is clearly within its federal question jurisdiction.  Some courts have held that their jurisdiction under §1331 does not arise until tribal remedies have been exhausted, and others have held that while the federal court has §1331 federal question jurisdiction, principles of comity require the federal court to abstain until tribal remedies are exhausted.  See, *Construction and Application of Federal Tribal Exhaustion Doctrine*, 186 A.L.R. Fed. 71 (2008).

there is no record on the issue that the federal court may consider. Here, Plaintiff requests this

Court to take control of what plainly should be the Tribal Court's decision in the first instance,

because Plaintiff failed to make such a record in the Tribal Court.  That is precisely the reason

for the rule of exhaustion in *Natl. Farmers Union*.  Developing that record in the federal

district court requires the court and the parties to expend resources on a track parallel to the

original litigation and to subsume the place and position of the Tribal Court decision maker,

and the result is the expenditure of federal judicial resources that might never have been

expended had the parties been required first to raise the issue in tribal court.

Similarly, tribal resources are now being diverted to respond to this federal action,

when, had the jurisdictional issue been raised in the tribal court in the first instance, no further

expenditure of resources might have been required.  In this case, comity requires that the issue

complained of should at least be raised and ruled upon in the first instance by the tribal court.

Although there is no record made in the tribal court on the federal constraints to jurisdiction in

these two tribal court cases, the following discussion illustrates the sources of the Suquamish

Tribal Court's authority, and the reasons that the Suquamish Tribal Court has a colorable claim

to jurisdiction.

**II. Federal Sources For Tribal Court Authority**

The entire discussion of tribal adjudicative authority changes when a Tribe acts

pursuant to a federal delegation of authority.  When a federal statute authorizes tribal

jurisdiction over a subject matter or a class of persons, the *Montana* analysis no longer applies,

and the question of subject matter jurisdiction is answered by the scope and breadth of the federal delegation.[3]

In *United States v. Mazurie*, 419 U.S. 544 (1975), the Supreme Court upheld the delegation of congressional authority to a tribe to regulate the introduction of liquor into Indian country:  "[W]e hereinafter conclude that federal authority was properly delegated to the Indian tribes. We conclude that federal authority is adequate, even though the lands were held in fee by non-Indians, and even though the persons regulated were non-Indians."  *Id*., 419 U.S. at 554.  The court based its conclusion on Congress' authority under Article I, Section 8 of the United States Constitution (the "Indian Commerce Clause"),  *id*., and because the delegation to tribes was "to entities which possess a certain degree of independent authority over matters that affect the internal and social relations of tribal life."  *Id*. at 557.  The Supreme Court has since repeatedly recognized this power.[4]

When considering subject matter and personal jurisdiction in entering an Order of Protection, the Suquamish Tribal Court is also guided by the federal Violence Against Women Act (VAWA) which provides: "Protection Order.  A protection order issued by a State, tribal, or territorial court is consistent with this subsection if – (1) <u>such court has jurisdiction over the parties and matter under the law of such</u> State, <u>Indian Tribe</u>, or territory; and (2) reasonable notice and opportunity to be heard is given to the person against whom the order is sought sufficient to protect that person's right to due process." 18 USC §2265(b) (emphasis added).  If

---

[3] Examples of such delegated authority may be found in the Clean Water Act (CWA) 33 U.S.C. §1377(e) and the Indian Child Welfare Act (ICWA) 25 U.S.C. §1911 (a).

[4] *See, e.g., Atkinson Trading Co*., 121 S. Ct. at 1830; *Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997); *South Dakota v. Bourland*, 508 U.S. 679 at 694-95 & n.15 (1993); *Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation,* 492 U.S. 408, 426 (1989)(White, J.)(*plurality opinion*); *Montana,* 450 U.S. at 564; *Mazurie,* 419 U.S. at 553-54.  *See also*, *Bugenig v. Hoopa Valley* Tribe, 266 F.3d 1201 (9th Cir. 2001)(en banc).

1  the tribal court complies with this section, its order will be given full faith and credit under 18

2  USC §2265(a).  Similar to the operative facts of *Mazurie* and *Bugenig*, the Congress does not

3  tie the tribal court's jurisdiction to federal sources of law under VAWA, but instead requires

4  the tribal court to have "jurisdiction over the parties and matter" "under the law of

5  such…Tribe." 18 U.S.C. §2265(b).  In addition, VAWA specifically calls out Tribal Court

6  jurisdiction in 18 U.S.C. §2265(e) and states:

7

8      Tribal Court Jurisdiction.  For purposes of this section, a tribal court shall have full
       civil jurisdiction to enforce protection orders, including any orders through civil
9      contempt proceedings, exclusion of violators from Indian lands, and other
       appropriate mechanisms, in matters arising within the authority of the tribe.
10

11      This language addresses one of the biggest issues surrounding domestic violence in

12  Indian country:  the uneven ground in the field of civil jurisdiction created by the *Strate* line of

13  cases by the Supreme Court.  By using the words "full civil jurisdiction," the Congress

14  acknowledged the existing federal common law that creates lacunae in a tribe's civil authority

15  over non-Indians and non-members, and delegates to the tribes "full" civil authority to enforce

16  "protection orders."

17

18      The language of the section is not restricted to protection orders issued by other

19  jurisdictions, and therefore, by necessary implication, the statute extends to orders of

20  protection issued by the tribe itself.  This conclusion is also born out by the language of

21  §2265(b), which validates tribal court protection orders entered pursuant to tribal law,

22  provided  "reasonable notice and opportunity to be heard is given to the person against whom

23  the order is sought sufficient to protect that person's right to due process."  This sentence

24  would be unnecessary were the tribes only to exercise this jurisdiction over tribal members and

25

26

non-member Indians, because the Indian Civil Rights Act (ICRA, 25 U.S.C. §§ 1301-03), at

section 1302(8) already provides a due process guarantee:

> No Indian tribe in exercising powers of self-government shall – (8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law; . . .

*Id.*  Therefore, the due process guarantee found in VAWA must apply to different persons and

subject matter than that contemplated in ICRA, or it would serve no purpose.  Given the "full

civil jurisdiction" language of Section 2265(e) of VAWA, it is apparent that the persons to

whom a tribe must guarantee due process in a VAWA proceeding are non-Indians.  All of these

factors point to a federal delegation of authority consistent with *Mazurie*.

Because there is little, if any case law directly on point, however, it would be beneficial

and consistent with the exhaustion doctrine to allow the Suquamish Tribal Courts to consider

in the first instance, whether VAWA is an independent source of delegated federal authority

which authorizes the Court's jurisdiction over non-Indians in civil Domestic Protection Order

proceedings.  The Tribe submits that this on-point source of federal authority creates a

"colorable" basis for tribal court jurisdiction sufficient to trigger the exhaustion rule.

**III.    Limitations on the Exhaustion Doctrine in Matters of Inherent Tribal Authority**

In *Boozer*, the Ninth Circuit Court of Appeals considered the exceptions to the

exhaustion rule that have evolved since *Nat'l. Farmers Union* in matters arising from a Tribe's

inherent authority.  Those exceptions include violations of express jurisdictional prohibitions,

and bad faith conduct or futility of assertion of tribal jurisdiction.[5]

---

[5] "'[T]he action is patently violative of express jurisdictional prohibitions,' *National Farmers Union*, 471 U.S. at 856 n.21, or it is otherwise plain that the tribal court lacks jurisdiction over the dispute, such that adherence to the exhaustion requirement would serve no purpose, other than delay. *Nevada v. Hicks*, 533 U.S.

Office of Tribal Attorney
P.O. Box 498
Suquamish, WA 98392
Tel. 360-598-3311;Fax 260598-4293

1   These limitations have come into play as the United States Supreme Court has

2   considered tribal courts' inherent, as opposed to federally delegated, authority over the conduct

3   of non-members in civil proceedings in cases that have arisen since the decision in *Montana v.*

4   *United States*, 450 U.S. 544 (1981). In that seminal case, the Supreme Court held that tribes

5   were "implicitly divested" of their inherent authority to regulate the conduct of non-members

6   on fee land within the reservation because of the tribes' dependent status. *Id.* at 564. *See also,*

7   *United States v. Wheeler*, 435 U.S. 313, 323 (1978). *Montana* also established at least two

8   exceptions to this general proposition, the first being the "consensual relations" exception:

9

10      To be sure, Indian tribes retain inherent sovereign power to exercise some forms of
        civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands.
11      A tribe may regulate, through taxation, licensing, or other means, the activities of
        nonmembers who enter consensual relationships with the tribe or its members, through
12      commercial dealing, contracts, leases, or other arrangements.

13   *Montana,* 450 U.S. at 565.

14

15   The second exception, known as the "threatening conduct" exception, is:

16      A tribe may also retain inherent power to exercise civil authority over the
        conduct of non-Indians on fee lands within its reservation when that conduct threatens
17      or has some direct effect on the political integrity, the economic security, or the health
        or welfare of the tribe.

18

19   *Id.* at 566.

20   In the late 1990's, the Supreme Court undertook to flesh out these exceptions

21   enunciated in *Montana,* first in *Strate vs. A-1 Contractors*, 520 U.S. 438 (1997), holding that a

22   tribal court could not exercise jurisdiction over a personal injury claim involving two non-

23   Indians when the accident occurred on a state highway right-of-way, which the Court

24

25   353, 369 (2001); *Strate [v. A-1 Contractors]*, 520 U.S. at 459-60 n. 14. Likewise abstention is not required
     'where an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith….or where
26   exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction.'
     *National Farmers Union*, 471 U.S. at 856 n21." Boozer, 381 F.3d at 935.

1    determined was the equivalent of non-Indian fee land for purposes of the *Montana* analysis.

2    *Strate,* 520 U.S. at 456. The *Strate* court found no consensual relationship between the non-

3    Indian defendant and the tribe under *Montana's* first exception. *Strate,* 520 U.S. at 457.  Since

4    the conduct at the heart of the dispute in *Strate* was by two non-Indians, and the conduct

5    (careless driving) did not arise to the level required to threaten the health, safety or welfare of

6    the tribe as set out in *Montana's* second exception, the tribal court lacked inherent authority to

7    hear and decide the case. *Strate,* 520 U.S. at 457-59.

8

9         Since *Strate*, the Supreme Court has continued to hone the meaning of the first and

10   second exceptions to *Montana*.  In *Atkinson Trading Co. v. Shirley*, 532 U.S. 645 (2001), the

11   Supreme Court struck down a Navajo Hotel Occupancy Tax imposed in part on non-member

12   travelers to the Navajo Nation, because the Atkinson Company's hotel was located on non-

13   Indian fee land.  Even though Atkinson Trading served only as the collector of the tax, the Court

14   reasoned that the Navajo Nation had no inherent authority to impose the tax on non-members on

15   non-Indian lands.  *Atkinson*,  532 U.S. at 659.

16

17        However, the most crucial part of *Atkinson* is its discussion of the first "consensual

18   relations" exception to *Montana*.  The Court spoke to the need for a nexus between the consent

19   given and the activity to be regulated:  "A nonmember's consensual relationship in one area

20   thus does not trigger tribal civil authority in another–it is not "in for a penny, in for a pound."

21   *Atkinson* at 656.

22

23        After *Atkinson*, in *Nevada v. Hicks*, 533 U.S. 353 (2001), a plurality decision, the

24   Supreme Court again interpreted *Montana* and the first exception, in determining whether the

25   tribal court had jurisdiction to hear a claim brought by a tribal member against a state game

26   warden who had applied for and received a warrant to search the claimant's home from both

the state and tribal courts.  While stating that "(w)e leave open the question of tribal-court jurisdiction over nonmember defendants in general," *Hicks* at 358, the Court went on to suggest that *Montana*'s rules may be applicable to all Indian lands, as well as fee lands:

> *Montana,* after announcing the general rule of no jurisdiction over non-members, cautioned that "[t]o be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands," 450 U. S., at 565-clearly implying that the general rule of *Montana* applies to both Indian and non-Indian land.  The ownership status of land, in other words, is only one factor to consider in determining whether regulation of the activities of nonmembers is "necessary to protect tribal self-government or to control internal relations."  It may sometimes be a dispositive factor.

*Hicks*, at 359, 360.

Based on these cases, the rule of exhaustion has been somewhat narrowed, as the exceptions to the presumption against inherent tribal jurisdiction over non-members initially set out in *Montana* have been narrowed.  If a Tribe's assertion of inherent civil jurisdiction over non-members of the Tribe does not fit within the first or second *Montana* exception, then the requirement that a federal court must abstain from exercising jurisdiction pending exhaustion of tribal court remedies becomes less rigid.  Unlike tort cases like *Strate* or *Hicks*, where the locus of an event may prove determinative not only of where the last act of a tort was committed and thus where jurisdiction lies or Tax cases like *Atkinson*, where the locus of a taxable event may determine whether a jurisdiction has a geographic taxing nexus, domestic relations maters most often involve continuing courses of conduct, and the locus of a particular event is less important.

Here, the factual circumstances are easily distinguishable from the facts in *Strate, Atkinson, and Hicks*. Unlike the non-member travelers in *Strate*, Plaintiff Martinez has resided within the boundaries of the Port Madison Reservation with his Alaska Native wife and

Office of Tribal Attorney
P.O. Box 498
Suquamish, WA 98392
Tel. 360-598-3311;Fax 260598-4293

children since at least 2000.  Next, unlike the parties in *Strate* and *Atkinson*, both parties in the

cases at hand have consensually and voluntarily submitted to the jurisdiction of the Suquamish

Tribal Courts since at least 2005, and each has filed cases concerning domestic relations

matters as a party plaintiff since 2007.  Even though these facts have not been raised to or

considered by the Suquamish Tribal Court, these activities repeatedly show the nexus between

the consent given by Plaintiff Martinez and the subject matter of domestic relations under the

Suquamish Tribal Court's jurisdiction.  Plaintiff Martinez only now challenges the Tribal

Court's jurisdiction after consenting to that court's jurisdiction not once, but at least four times,

prior to raising this issue in this forum.  Thus, unlike in *Strate, Montana*'s first exception is

met, as will be shown below.

**IV.        The  Basis For Inherent Tribal Authority In This Matter**

A.    Consensual Relationship Exception to *Montana*

Two recent Ninth Circuit cases illustrate a developing interpretation of the consensual

relations portion of the *Montana* test, and apply here.  In the first case, *Smith v. Salish

Kootenai College*, 434 F.3d 1127, 1140 (9th Cir.)(en banc)(2006) *cert. denied*, 547 U.S. 1209

(2006), the Ninth Circuit Court of Appeals held that the Courts of the Confederated Salish and

Kootenai Tribes properly had jurisdiction over a tort claim brought by a non-member against

the tribally-owned college.  After a lengthy analysis of *Montana* and the later cases which

refine *Montana,* the Court concluded that Smith, "by the act of filing his claims" in the tribal

court, consented to the jurisdiction of that Court. *Id*. at 1140. The Court noted that it was not

until after Smith lost the case that he raised the issue of lack of subject matter jurisdiction for

the first time. *Id*. at 1129. The Ninth Circuit distinguished these circumstances from those set

out in *Strate*, and while noting that  "[t]he {Supreme}Court has repeatedly demonstrated its

Office of Tribal Attorney
P.O. Box 498
Suquamish, WA 98392
Tel. 360-598-3311;Fax 260598-4293

1   concern that tribal courts not require 'defendants who are not tribal members' to 'defend

2   (themselves against ordinary claims) in an unfamiliar court'[6], concluded that these concerns

3   were not present because Smith voluntarily chose to appear in the forum, first as a Defendant,

4   and then as a Plaintiff in cross claim, with only the cross claim surviving.   The Court further

5   observed that while Smith's "suit does not fit obviously within the two exceptions set out in

6   *Montana*," it was most closely allied with *Montana*'s consensual relations exception.  *Smith* at

7   1136, 1140.  The Court concluded that "even though his claims did not arise from contracts or

8   leases with the Tribes, Smith could and did consent to the civil jurisdiction of the Tribe's

9   courts."  *Id*. at 1136.

10

11       Similarly, in *Atwood*, the non-Indian requesting federal intervention in a tribal court

12  custody proceeding had originally appeared as a Plaintiff petitioning for custody of his

13  daughter in that tribal court, some eight years prior to the tribal court action he sought review

14  on.  The Ninth Circuit Court of Appeals noted that "Plaintiff availed himself of that forum

15  voluntarily when the original custody dispute arose in 1997, which is at least a 'colorable'

16  basis for jurisdiction, even though the current tribal court case was not initiated by Plaintiff."

17  *Id*., 513 F.3d at 948.

18

19       In each of the cases cited, at least one party to the action was "tribal" in nature.  In

20  *Smith,* the defendant on the cross claim was the tribally-owned college.  In *Atwood*, the

21  plaintiff was the tribal member grandmother seeking custody of Atwood's daughter.  In the

22  Supreme Court's post *Montana* jurisprudence, there must be some tribal tie to the litigation in

23  tribal court in order for the tribal court jurisdiction.  In *Strate*, for example, the tribes "were

24

25

26
_____

[6] *Smith*, at 1131, citing *Strate*, 520 U.S. at 442, 459.

strangers" to the accident that brought the two non-Indian parties to tribal court.  *Strate*, 520

U.S. at 457.  Here, neither Martinez is a stranger to the Tribe.

First, Helen Martinez is an Alaska Native, and an Indian for purposes of tribal criminal

jurisdiction.  She resides within the Port Madison Indian Reservation. Under the Indian Civil

Rights Act, 25 U.S.C. § 1301, the Congress has set out the inherent basis for Tribal criminal

jurisdiction for non-members:

> 1) "Indian tribe" means any tribe, band, or other group of Indians subject to the
> jurisdiction of the United States and recognized as possessing powers of self-
> government;
> (2) "powers of self-government" means and includes all governmental powers
> possessed by an Indian tribe, executive, legislative, and judicial, and all offices, bodies,
> and tribunals by and through which they are executed, including courts of Indian
> offenses; and means the inherent power of Indian tribes, hereby recognized and
> affirmed, to exercise criminal jurisdiction over all Indians;

The Suquamish Tribe, therefore, has substantial governmental authority over Ms. Martinez and

her conduct while she is within the Port Madison Indian Reservation.  In fact, the Tribe has

exercised its inherent criminal jurisdiction over Ms. Martinez at least three times since 2001,

each time for domestic violence related assault charges.  *See* Ex. 2, Aff. of Marilyn Kay.

Those assault charges resulted in the Court requiring the provision of extensive Tribal social

services to Ms. Martinez, including transitional housing, and individual and group drug,

alcohol and mental health counseling.  The Tribe has a particular governmental interest in not

only Ms. Martinez' criminal actions, but in the troubled marriage which appears to be a fount

for these problems, and in protecting all persons in the family from further domestic violence

while they reside within the Reservation.  There is a direct relationship between the Tribe's

inherent criminal jurisdiction over one of the parties, and every other civil action now before

the Tribal Court.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

In addition, the Tribe, as a government, has an interest in protecting all of its citizens, whether they are members or guests.  The United States Supreme Court's initial cases concerning the civil jurisdiction of tribes, made common reference to non-Indians, and did not tend to distinguish member Indians from non-member Indians.  But since *United States v. Wheeler*, and *Oliphant v. Suquamish Tribe*, the Court has focused more and more on the distinction between members and non-members for purposes of jurisdiction rather than Indian and non-Indians.

It was this distinction between a Tribe's inherent powers to govern its own membership, when compared to what the Supreme Court characterized as powers over non-members no longer consistent with the Tribe's dependant status, that led the Supreme Court to conclude, in *Duro v. Reina*, 495 U.S. 676, 693-694, that Tribes no longer had authority to try non-member Indians for crimes committed on the Reservation.  After the United States Supreme Court ruled in *Duro,* Congress was quick to pass the so called "Duro fix" legislation which amended 25 USC §1301(2) to state that "powers of self government means….the inherent power of Indian Tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians."  The United States Supreme Court accepted and confirmed Congress' ability to "relax restrictions" on an inherent tribal power without creating a congressional delegation of authority in *United States v. Lara*, 541 U.S. 193 (2004).

The upshot of Congress' action to "fix" *Duro*, and the United States Supreme Court's acceptance of that in *Lara*, is that much of the Supreme Court's careful distinguishing between member Indians and non-member Indians is now called into question. Yet there has been no case since *Lara* which has addressed the full implications of Congress' action in "recognizing and confirming" the tribes' inherent criminal authority over non-member Indians.  One of

those implications is that if Tribes have the inherent power to try and imprison a non-member Indian for violating the tribe's criminal code, do they not also have the lesser included power to regulate the non-member Indian's conduct in the civil forum?  It would be paradoxical if the tribes, on the one hand retained the power to directly impinge on the liberty interests held most dearly in the jurisprudence of the Court,[7] while at the same time lacked civil powers which, when asserted, have no similar impact on liberty.

For these reasons, the Suquamish Tribe asserts first, that its criminal jurisdiction over Helen Martinez has a direct and inextricable link to the two actions now before the Suquamish Tribal Court.  Second, the tribe asserts that it does in fact retain inherent civil authority over Helen Martinez, at least insomuch as that authority is a necessary corollary to its complete exercise of inherent criminal authority, and its responsibility as a government to provide access to civil proceedings which will lessen or reduce the incidence of violence in a family over whom the Suquamish Tribe does hold, at least over one member of the marital community, substantial criminal authority.

And even if this complex relationship between the Tribe and Helen Martinez does not in and of itself, equate to a sameness between Helen Martinez and a Suquamish Tribal member, it nonetheless describes a relationship between the government and the governed, and between the policies of the tribe and Ms. Martinez sufficient to support an initial decision to require exhaustion of tribal remedies in this matter.  Further bolstering this conclusion is Ms. Martinez' long history of voluntary appearances before the court in civil matters related to the troubles in her marriage, and the violence that has characterized it.  These appearances comport also with the concept of consensual relations with the court as expressed in *Smith* and *Atwood*.

---

[7] *Duro*, 495 U.S. at 693.

Plaintiff Daniel Martinez is in a similar position.  He <u>chose</u> to enter the Suquamish Tribal Court in 2007 to seek an Order of Protection against his wife, Helen Martinez. The Court acted on his Petition, and granted a Temporary Order of Protection in his favor.  He did not object to the Tribe's jurisdiction at any time.  And he willingly appeared as a party defendant in at least one prior action to dissolve his marriage with Helen Martinez in that same year.  Martinez was no stranger to the Suquamish Tribal Courts, when his wife Helen named him as respondent in her Petition for Order for Protection in 2008.  He appeared, responded, and gave evidence.  He did not raise the Court's jurisdiction at any time, even after the Court had entered a permanent Order of Protection against him in 2008, until he raised it for the first time in this federal action.  Thus, Martinez was both a consensual Plaintiff and Defendant in two separate actions for DV protection orders[8], each under the identical statute, each in the identical court, and each with the identical parties.  In one he was the alleged victim, and in one the alleged aggressor.  That is the only difference.  Martinez was not in an "unfamiliar court" but rather in a court that had afforded him relief in the past, and in which he understood how to proceed.  This is sufficient to show that the Tribal Court's initial assertion of jurisdiction in this matter was colorable for purposes of the exhaustion doctrine.

B.  <u>Threatening Conduct Exception to *Montana*</u>

The second exception to the Montana rule involves non-member conduct on fee land within a reservation which threatens "the political integrity, the economic security, or the health or welfare of the tribe." *Montana* at 566.   Asserting the second exception under *Montana* is factually intensive, because of the need to show the specific nature of the harm

---

[8] In either action, the Court, after hearing all the evidence, could have re-aligned the parties based upon the evidence.  See, Suq. Trib. Code §7.28.5(2).

Office of Tribal Attorney
P.O. Box 498
Suquamish, WA 98392
Tel. 360-598-3311;Fax 260598-4293

claimed, and how the harm impacts not only individual tribal members, but the tribe itself. Whether the Suquamish Tribal Court has a colorable claim to jurisdiction under this exception requires facts on the record,[9] but there are no facts on record in the Suquamish Tribal Court to review. Here, the doctrine of exhaustion is utterly thwarted if the Tribal Court has had no opportunity to rule on the matter of subject matter jurisdiction as a matter of federal and tribal law before a federal court is asked to determine whether tribal court jurisdiction is lawful.

C.   Exceptions to Exhaustion Rule in This Case

Based upon the extremely limited record now before this Court, the following sections address the known exceptions, cited in Section III above, to the requirement for exhaustion of tribal remedies.

1.   No Futility

As noted in *Boozer,* it is clear that Plaintiff has failed to take a single step to challenge the Suquamish Tribal Court's jurisdiction, and is in no position to say that "exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction." *Nat'l Farmers Union*, 471 U.S. at 856 n.21.  In fact, the question of subject matter jurisdiction may be raised in the Suquamish Tribal Court at any time, even post judgment, as it may be in state court.[10]  The Suquamish Tribal Court is authorized to look to federal statutory and common law in determining jurisdiction as set out in Suq. Trib. Code § 4.1.4 (1994).  Even if the trial court declined to hear the issue, the declination would itself be subject to appeal in the

---

[9] Certainly, it would be important to consider the population of the reservation, the number of tribal members affected, and the size of the reservation as factors.  The issue of Domestic Violence is significant enough that the Tribe has constructed a "transitions house," has a Domestic Violence Code, and directs significant judicial, law enforcement and health and human services resources at the issue.  *See* Ex. 2, Aff. of Marilyn Kay; Exhibit 3, Tribal Domestic Violence Code.

[10] *See, Smith* at 1137.

Office of Tribal Attorney
P.O. Box 498
Suquamish, WA 98392
Tel. 360-598-3311;Fax 260598-4293

Suquamish Court of Appeals. Suq. Trib. Code § 4.6.1 (1994).  But first the plaintiff must raise the issue, make the motion, and argue it.  That, Plaintiff has failed to do.

### 2.  No Bad Faith

Similarly, neither Plaintiff's federal complaint nor the history of the parties' actions in Tribal Court suggest any bad faith in bringing the cases before the Tribal Court.  The parties have a lengthy history of appearances before that court, a great many of which revolve around issues of domestic violence and what appears to be a seriously troubled marriage.  These appearances are not lopsided in favor of one party or the other.  Each has appeared before the Court, and each have sought and received relief from the Tribal Court.  *See*, Exhibit 2, Affidavit of Marilyn Kay.  It cannot be said that a court acting pursuant to its own jurisdictional statute, and being presented with a case or controversy which falls within the ambit of its authority, acts in bad faith when asked by two parties to decide the matter.  There are simply no allegations of bad faith or harassment in the Complaint.

### 3.  No Unreasonable Delay

Exhaustion here would not result in unreasonable delay because the Tribal Court has never been asked to consider its own jurisdiction; in taking the time to do so, it would create a record that would avoid future waste of judicial resources.  As the Supreme Court noted in *Nat'l. Farmers Union:*

> The risks of the kind of "procedural nightmare" that has allegedly developed in this case will be minimized if the federal court stays its hand until after the Tribal Court has had a full opportunity to determine its own jurisdiction and to rectify any errors it may have made.

*Nat'l. Farmers Union*, 471 U.S. at 856-857.  *See also, Stock West Corp. v. Taylor*, 964 F.2d 912, 917-920 (9th Cir. 1992).

1

### 4.   No Violation of an Express Jurisdictional Prohibition

2

#### a.   No Express Federal Bar

3

4   Finally, Plaintiff has not asserted, nor can he that the Tribal Court's assumption of

5   jurisdiction over these two matters "is patently violative of an express jurisdictional

6   prohibition." *Nat'l. Farmers Union*, 471 U.S. at 856 n.21.  None of the Supreme Court cases

7   cited above are on point, and there is no federal statute which bars the Tribal Court from

8   hearing these matters.[11]

9   The mere assertion by Plaintiff that Plaintiff's home is located on fee land within the

10   Port Madison Indian Reservation also does not resolve the matter, for several reasons.  First,

11   the original Petition for Order for Protection does not say where the violence occurred. *See Ex.*

12   *1, Petition* for Order of Protection.  Because domestic violence often manifests as a continuing

13   course of conduct, as it does here, the violence may occur at more than one location, and its

14   effects may be felt not only by the immediate victims, but the community as a whole.[12]

15

16   Second, the scope of the Tribe's jurisdiction to hear and decide this matter may hinge as much

17   upon the relationship of the parties to the Tribal Court as on the locus of a particular event.

18   Third, as to the Dissolution Petition, that action depends on the status of the parties and not the

19   locus of any particular event, and therefore may also be dependent more on the nature of the

20   parties' relationship with the Tribal Court than with a particular location.  Finally, the question

21

22

23   [11] Virtually all cases which have considered what an "express jurisdictional prohibition" is have concluded that the prohibition arises under federal statutory law.  See, e.g., *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S.

24   473(1999)(Price Anderson Act); *Northern States Power v. Prairie Island Mdewakontan Sioux Indian Community*, 991 F.2d 458 (8th Cir. 1993)(Hazardous Materials Transportation Act); *Blue Legs v. U.S. Bureau of Indian Affairs*,

25   867 F.2d 1094 (8th Cir. 1989)(RCRA).

26   [12] *See* United States Department of Justice, Office on Violence Against Women website, http://www.ovw.usdoj.gov/domviolence.htm; http://www.ovw.usdoj.gov/TribalCol.htm .

of whether the Tribe's authority to act is inherent or delegated may also be far more germane than the fee status of the parties' home.

b.   No Express Tribal Bar to Jurisdiction

There is nothing in the Suquamish Tribal Code which would expressly prohibit the Suquamish Tribal Court from assuming jurisdiction in either matter now before that Court.[13]   It is clear that, absent an objection by either of the parties, the Suquamish Tribal Court's jurisdictional statute grants the Court subject matter jurisdiction over

> . . .all cases and controversies within the territorial jurisdiction of the Suquamish Tribe, including but not limited to: (b) all actions under the civil regulatory jurisdiction of the tribe; (c) all civil actions involving any Indian person, tribe organization, or property; and (d) all other matters placed within the jurisdiction of the tribal court by action of the Suquamish Tribal Council or the Congress of the United States."

Suq. Trib. Code § 3.2.1 (attached to this motion as Ex. 3).

Additionally, the Tribe has adopted a Domestic Violence Protection Ordinance which is set out at Chapter 7.28 of the Suquamish Tribal Code.  The code sets out its own section on jurisdiction and venue and states:  "Any person make seek relief under this chapter by filing a petition with the tribal court alleging that the person has been the victim of domestic violence committed by the respondent.  The person may petition for relief on behalf of himself or herself, and on behalf of minor family or household members."  *See*, Ex. 3.  Both Daniel Martinez and Helen Martinez have applied for and obtained relief under this statute.

As well, the Tribe's Marriage and Divorce Ordinance, set out at Chapter 9.1 of the Suquamish Tribal Code, does not limit the Tribal Court's authority to Tribal members:

---

[13] The Tribal Code, does, for example, limit the Tribal Court's authority in criminal matters to "all crimes committed by Indians."  Suq. Trib. Code § 3.2.1(a) (1994). Therefore, trying a non-Indian would be expressly barred by the Tribe's own law.

1

2   The Suquamish Tribal Courts shall have jurisdiction to hear and determine all family matters including but not limited to divorce, separate maintenance, annulment, determination of paternity and support, custody of minor children, and division of all personal and nontrust real property.

3

4   Suq. Trib. Code § 9.1.1.[14]  Therefore, in each of the Tribal Court actions, the Tribal Court had

5   authority to act in the subject matter under Suquamish statutory law.

6       In conclusion, there are no applicable exceptions to the exhaustion rule which would

7   prevent the federal district court from abstaining in this matter until the Suquamish Tribal

8   Court has had a first opportunity to hear and decide the issue of subject matter jurisdiction.

9   For all the forgoing reasons, the Suquamish Tribe respectfully requests the Court to dismiss

10  this action pending exhaustion of remedies in the Suquamish Tribal Court.

11

12                  Respectfully submitted this 8th day of November, 2008.

13

14                  By:  s/ James R. Bellis                    .
15                  James R. Bellis, Esq.
                    WSBA No. 29226
16                  Tribal Attorney
                    The Suquamish Tribe
17                  P.O. Box 498
                    Suquamish, WA 98392-0498
18                  Office: 360-394-4501
                    Fax:    360- 598-4293
19                  rbellis@suquamish.nsn.us

20

21

22

23

24

25

26
_____
[14] Note that this section disclaims jurisdiction over real property held in trust by the United States.